Robert P. Murray, Pro Se
823 E. Main St. #A119, Richmond VA 23219
+1 (804) 767-6542
WIED4RM@TheCaseOfTheMissingMSA.org
Plaintiff

U.S. DISTRICT COURT
EASTERN DISTRICT - WI
FILED

2026 OCT 30 P 2:53

CLERK OF COURT

PEPPER

26-C 2028

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Robert P. Murray,<br><br>Plaintiff(s),<br><br>v.<br><br>Bryan D. **Keberlein**, in his Individual Capacity and his Official Capacity as Branch III Judge of Winnebago County Circuit Court, Judiciary Courts Of The State Of WI; Stephanie **Koenigs**, in her Individual Capacity and her Official Capacity as Branch III Court Reporter for Winnebago County Circuit Court, Judiciary Courts Of The State Of WI; Michael D. **Rust**, in his Individual Capacity and his former Official Capacity as Court Commissioner for Winnebago County; Tara **Berry** (nka. Tara **Granditzke**), in her Individual Capacity and her Official Capacity as former Clerk of Courts for Winnebago County; Missy **Woldt**, in her Individual Capacity and her Official Capacity as Judicial Assistant for Winnebago County Circuit Court; Julie **Mabry**, in her Individual Capacity and her Official Capacity as Director of the Winnebago County Child Support Agency; Trista L. **Moffat** in her Individual Capacity and her Official Capacity as an Officer of the Winnebago County Circuit Court; Peter J. **Culp** in his Individual Capacity and his Official Capacity as an Officer of the Winnebago County Circuit Court; Kathleen M. **Healy** in her Individual Capacity and her Official Capacity as an Officer of the Winnebago County Circuit Court and Assigned Receiver; Adam P. **Fitzgibbon**, in his Individual Capacity; Lisa S. **Neubauer** in her Individual Capacity and her Official Capacity; Maria S. **Lazar** in her | Case No.<br><br>**COMPLAINT FOR CIVIL RIGHTS DEPRIVATION(S) RELATED TO MAY 9, 2025 AND OCTOBER 30, 2026**<br><br>Code:<br><br>Judicial Officer:<br><br>Courtroom:<br><br>Hearing Date & Time:<br><br>DEMAND OF JURY TRIAL ON ALL ISSUES SO TRIABLE |

Individual Capacity and her Official Capacity; Shelley A. **Grogan** in her Individual Capacity and her Official Capacity; Mark D. **Gundrum** in his Individual Capacity and his Official Capacity; Anthony F. **LoCoco** in his Individual Capacity and his Official Capacity; Kirsten **Navarrette** in her Individual Capacity and her Official Capacity; Desiree M. **Bongers** in her Individual Capacity and her Official Capacity; Joshua L. **Kaul** in his Individual Capacity and his Official Capacity; Daniel B. **Peters** in his Individual Capacity and his Official Capacity; Julian **Marrufo** in his Individual Capacity and his Official Capacity; Anna M. **Kees** in her Individual Capacity and her Official Capacity; Samuel C. **Hall**, Jr. in his Individual Capacity and his Official Capacity; Gregory A. **Parker** in his Individual Capacity and his Official Capacity; Laura **Nelson** in her Individual Capacity and her Official Capacity.

Defendant(s).

## COMPLAINT

1. In filing this complaint, Robert P. Murray ("Plaintiff") respectfully alleges all that follows, based on the best information available to his at the time of this filing. It seems inevitable that one or more Amended Complaints will be necessary as better information becomes available during discovery.

2. This Complaint incorporates all violations that Plaintiff believes to be ripe for this Court's adjudication. It should not be joined with any parallel claims that involved many or all of these Defendants, as this Plaintiff's harms are unique. Further, if discovered documentation so justifies, Plaintiff may include *as Defendants* the Plaintiff(s) of parallel claims (e.g. 26-CV-23, 26-CV-625, 26-CV-1376) before the U.S. WI Eastern District ("**WIED**") Court. Plaintiff(s) in those parallel claims may expand. Few affected corporations, individuals, and departments or agencies the U.S. and State of Wisconsin government are yet aware of the facts within these cases but are becoming so.

3. Plaintiff is a candidate for U.S. House of Representatives for Virginia's 4th

Congressional District, primarily motivated for public service by his experience in many of the claims within this Complaint. In multiple states and in the District of Columbia, both onsite (e.g. public libraries, Capitol steps) and online, he has presented (and continues to present) information within this Complaint to the public as part of his campaign to transform family law nationwide.

# I. TABLE OF CONTENTS


I. TABLE OF CONTENTS ........ 3

II. PRELIMINARY STATEMENT ........ 4

III. JURISDICTION AND VENUE ........ 6
- A. Federal Question ........ 6
- B. Declaratory and Injunctive Power ........ 7
- C. Venue ........ 7
- D. Rooker-Feldman and the Independent Injury Doctrine ........ 7
- E. Eleventh Amendment and Official Capacity ........ 9
- F. Abstention and the Domestic Relations Exception ........ 10
- G. Timing and Accrual of Claims ........ 10
- H. Lost judicial and quasi-judicial immunity ........ 12

IV. PARTIES ........ 13

V. LEGAL FRAMEWORK (U.S. FEDERAL) ........ 17
- A. Defining U.S. "Constitutional Rights" as used herein ........ 18

VI. LEGAL FRAMEWORK (WISCONSIN) ........ 20
- A. Wisconsin judicial operations. ........ 20
- B. WI Domestic Relations / Family Law and "The Family Code" ........ 22
- C. Limits of immunity granted by the State of Wisconsin ........ 25

VII. STATEMENT OF FACTS ........ 25
- A. WCC's loss and destruction of the Fitzgibbon's MSA ........ 26
- B. Falsification of a Divorce Judgement and M.S.A. (R.127) ........ 30
- C. Wrongful enforcement of the forged Judgment (R.127) ........ 38
- D. Further wrongful enforcement of the forged Judgment (R.127) ........ 42
- E. Wrongful order of a Receiver to enforce forged Judgment (R.127) ........ 46
- F. Wrongful enforcement of R.127 ongoing. ........ 47

VIII. RESERVATION OF RIGHTS ........ 49

IX. JURY DEMAND ........ 50

X. PRAYER FOR RELIEF ........ 50
- A. Fees and Costs ........ 51
- B. Other Relief ........ 51





Case 2:26-cv-02028-PP Filed 10/30/26 Page 3 of 52 Document 1

## II. PRELIMINARY STATEMENT

4. This is a civil rights action brought under 42 U.S.C. §§1983, 1985(2), and 1985(3) to redress the Plaintiff's civil rights deprivations and resulting injuries caused by the Defendants leading up to, occurring during, or following a Winnebago County Court (**WCC**) hearing for case **#21FA0564** held on May 9, 2025.

5. Defendants are familiar with most of the facts in this Complaint, which benefits from following parallel cases (WIED 26-CV-23, 26-CV-625, 26-CV-1376). For brevity, Plaintiff incorporates herein all filings from those cases, which have been consolidated into WIED 26-CV-23. Critically, the instant case does not depend upon any judicial outcome of those cases. Even if Defendants' acts within those parallel cases are determined to be wholly lawful and just, the instant case deserves its own fair adjudication.

6. Plaintiff may seek joinder of additional similarly situated victims ("Future Plaintiffs", e.g. State of Wisconsin, U.S. Government Agency and Departments, Agencies, corporations, individuals) within the time permitted by FRCP 15 and 20. These victims have been largely unaware of this case's events, as they had entrusted the systems, complete with segregated duties and other process controls, to ensure the accuracy of the information upon which they were relying to perform their work. Their injuries appear distinctly different (U.S.C.s beyond Title 42) from Plaintiff's rights deprivation, but the fact base is equivalent. This Complaint depends on no other known Plaintiff.

7. This Complaint seeks to hold all Defendants accountable, declare R.127 *void ab initio*, gain financial remedy, and restore a path for the Plaintiff to exercise his U.S. Constitutional rights (see *infra*, each subsection of Section V. A. ).

8. In 2022,a sophisticated fraud occurred in Winnebago County Court by a state


Case 2:26-cv-02028-PP Filed 10/30/26 Page 4 of 52 Document 1

judicial officer (Keberlein), his staff (Woldt), other state court (Koenigs) and county (e.g. Mabry, Berry / Granditzke) employees and a private citizen (Fitzgibbon). This had been and/or continues to have been supported by court officers (Moffat, Culp). These preface Keberlein ordering Healy to act as a Receiver.

9. In #26-CV-23, the Plaintiff (same as in the instant case) alleged that during a period spanning January 6-12, 2023, those Defendants conspired then (or promptly thereafter in direct response) and mutually benefited from creating and subsequently using falsified (or "forged"[1]) official court records, which wrongly purport to memorialize a divorce judgment (and thus divorce contract) between the State of Wisconsin, Adam, and Elizabeth. There are many motives for these parties' actions. One was to conceal the records retention liability incurred by the County and Court for their negligence when they lost/destroyed the Elizabeth's proposed Marital Settlement Agreement (MSA) soon after it was submitted in person on January 28, 2022 (as the court's records clearly confirm). Another was judicial retaliation against Elizabeth and Adam for being unable to reach and file a new MSA, as this had prevented bookending the County's and Court's records retention liability, which had continued to accrue for around 11 months (the court's records and transcript clearly document the Court's frustration). Yet another reason was the Elizabeth's honesty, which kept her from testifying to terms that the Court wished, as following the Court's approach would result in Elizabeth fabricating facts and perjuring herself. This differentiated Elizabeth from Adam, as Adam had wavered repeatedly before, during, and after the January 6, 2023 hearing. When Elizabeth was unwilling to adopt those Defendants' approach in falsifying the record, those Defendants sought to coerce Elizabeth into accepting their actions as

[1] The verb "forged", or noun "forgery", refers to the creation or alteration of contractual documents (or the documents themselves) with information (e.g. approvers/signers, dates, and financial terms) primarily by Defendants Keberlein, Woldt, and Adam Fitzgibbon, with the intent to deceive others (e.g. the Wisconsin and U.S. governments, general public) and intentionally benefit the Defendants.


Case 2:26-cv-02028-PP Filed 10/30/26 Page 5 of 52 Document 1

just and procedurally sound (despite being neither).

10. As such, the instant case is a civil rights action brought under 42 U.S.C. §§ 1983 and 1985(2) to redress the Plaintiff's civil rights deprivation and resulting injuries caused by the Defendants.

11. At the time of this Complaint's filing, neither #26-CV-23 nor #26-CV-625 have yet to advance to Discovery. When either or both do, Plaintiff expects that the instant case will also benefit from its discovered information, which the Plaintiff has been unable to reasonably and previously obtain.

12. Plaintiff may seek joinder of additional similarly situated plaintiffs ("Future Plaintiffs", e.g. State of Wisconsin, U.S. Government Agency and Departments, Agencies) within the time permitted by Fed. R. Civ. P. 15 and 20.

13. Frequently, Wisconsin's Winnebago County Court case record numbers (R.###) are cited in reference to materials filed in that court's case #21FA564. Most frequently are the Defendants' fabricated, filed, and utilized "Third Amended Martial [sic] Settlement Agreement" ("**MrSA**", R.126) and the final falsified divorce Judgment that incorporated the MrSA (R.127), which falsely purports to have memorialized an Agreement between FCC John Bermingham, Adam, and the Plaintiff on February 7, 2022, some 11 months before R.126-R.127 were created and some seven months *after* John Bermingham had retired, resigned from the Wisconsin Bar, and was no longer eligible to approve any such document, which he later disclaimed ever knowing anything about.

## III. JURISDICTION AND VENUE

### A. Federal Question

14. This action arises under the Constitution and laws of the United States, specifically 42 U.S.C. §§1983 and 1985(2-3), and the doctrine of local government liability set forth in *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658

(1978) to redress the deprivation of rights secured by the Fourteenth Amendment and the conspiratorial obstruction of justice in state proceedings. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 (federal question) and 28 U.S.C. §1343(a)(3) (civil rights).

**B. Declaratory and Injunctive Power**

15. This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§2201–2202 and Federal Rules of Civil Procedure 57 and 65, particularly as it relates to the 1996 amendments to §1983 regarding judicial officers.

**C. Venue**

16. Venue is proper in the United States District Court for the Eastern District of Wisconsin pursuant to 28 U.S.C. §1391(b). A substantial part of the events and omissions giving rise to these claims that primarily occurred in Winnebago County, Wisconsin. Furthermore, most Defendants are believed to reside in or conduct official business within this District.

**D. Rooker-Feldman and the Independent Injury Doctrine**

17. This action is not an appeal of a valid state court judgment or Order, nor does it seek to fix or overrule a valid domestic relations decree or any other civil contract. Instead, Plaintiff seeks redress for independent U.S. Constitutional injuries caused by the Defendants' acts (or enablement of), including due process, equal protection, and right to voluntarily contract.

a. Forgery: Via non-judicial, unauthorized acts, Keberlein, Koenigs, Woldt, and Adam directly co-operated to falsify official court documents that most other Defendants (e.g. Berry, Mabry, Rust, et. al) used for their own discrete purposes. Thus, all sustained the forgeries through what should have been independent roles, each with their own quality controls to ensure no improper documents were used. Each of these people (and the forgeries) falsely purport that the documents are a "reconstruction" of a January 28, 2022 Marital Settlement


Case 2:26-cv-02028-PP Filed 10/30/26 Page 7 of 52 Document 1

Agreement, which the WCC destroyed in its case #21FA564. Further, these parties forged a Judgment, incorporating this records #120-122 and #126-127, as ordered by #125 (henceforth collectively simplified as "**R.127**") that never existed. None of R.127's three parties listed as R.127's approvers approved the document when R.127 claims they did, or under the terms specified in R.127. No authority existed to create R.127, so its creation was a non-judicial act (e.g. individual and/or unauthorized administrative act). R.127's existence prevents an actual, lawful Judgment with Marital Settlement Agreement from being created. R.127 is not a "Judgment" entitled to federal deference, precluding the application of Rooker-Feldman. Until

b. Administrative Fabrication and Extrinsic Fraud: #26-CV-23 detailed how Judge Bryan D. Keberlein led the falsification a divorce judgment (R.127) that inaccurately purports to have been made and approved by other people, at another time, with different provisions, and using authority of one who did not give (and could not have given) such authority (FCC Bermingham). As Keberlein's actions occurred entirely outside all authorized judicial processes, Keberlein not only lacked all jurisdiction, but had no other authority to create R.127, much use it thereafter and neither did any of the other Defendants. The use of forged filings is fraud and any resulting decision must be *void ab initio*, not an official judgment entitled to deference.

c. Disqualified Adjudicator: Upon the Elizabeth's dispute of the forged documents, Keberlein was by WI §757.19(1-2) obligated to ("shall") disqualify himself for multiple reasons (e.g. §757.19(2)(d) "When a judge prepared as counsel" including for the State of Wisconsin, "any legal instrument or paper whose validity or construction is at issue."). At the time of R.127's creation, Keberlein represented the State of

Wisconsin's interests in the case per WI §767.205(2) "When the State is a real party in interest". He was disqualified then and thereafter, all the way up to and during the May 9, 2025 trial, as well as after.

d. Independent Harms: Pursuant to the *Independent Injury Doctrine,* Plaintiff (not just Elizabeth) seeks damages for the harms caused by the use of R.127 and Keberlein's refusal to disqualify himself from the case and clear decision to instead preside over the hearing. All other Defendants supported and enabled Keberlein's actions, before, during, or after. Keberlein's and these other Defendants deprived the Plaintiff of Fourteenth Amendment right to procedural and substantive due process (his loan claims were WCC acknowledged on record, but then ignored), but other violations of Plaintiff's rights secured by the U.S. Constitution (e.g. diminished personhood).

18. No State Interest. The State of Wisconsin has no legitimate interest in the finality of a judgment or case record that is based on forgery and fraud. Moreover, any attempt to do so can only seek to preserve and expand the ongoing fraud, thus merely creating more Defendants.

**E. Eleventh Amendment and Official Capacity**

19. While the Eleventh Amendment may bar certain claims for damages against the State, it does not bar claims for declaratory or injunctive relief against state officials in their official capacity. Plaintiff's sought relief (at least that R.127 is declared *void ab initio*) falls squarely within the *Ex Parte Young* exception. Furthermore, this Court has jurisdiction over the entity-level policies and customs that fail U.S. Constitutional protections pursuant to *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), should it become clear that any of the Defendants' actions were guided by their governmental employers and/or policies. However, such allegations will remain speculative until Discovery permits

depositions and evidentiary reviews (e.g. communications between the Defendants, as well as between the Defendants and unknown (but likely) third parties). These may include (among others) peer Winnebago judges (Teresa Basiliere, Michael Gibbs, John Jorgensen, Daniel Bissett, or even Scott Woldt, the husband of Defendant Woldt), Chief Judge Guy D. Dutcher of Wisconsin's Fourth Judicial Administrative District, various justices of the Supreme Court of WI, other attorneys serving within the A.G.'s Office, or members of the WI Judicial Conduct Advisory Committee (the Chair of which is Keberlein), et. al.

### F. Abstention and the Domestic Relations Exception

20. As the Seventh Circuit held in *Loubser v. Thacker*, 440 F.3d 439 (7th Cir. 2006), the domestic relations exception does not bar a §1983 action where a plaintiff alleges a conspiracy to deprive her of due process through the manipulation of the judicial process. *Loubser* closely align with the instant case, which does not require this Court to issue any Order or Judgment related to a divorce, a child's custody, or any financial support (child or alimony) or alter any valid domestic relations Judgment, but instead seeks this Court's determination as to whether or not some or all of the Defendants deprived the Plaintiff of any U.S. Constitutional right as the Plaintiff will later enumerate. Federal courts have a virtually unflagging obligation to exercise their jurisdiction and even more so when a State court's forged Judgment is at the core of the complaint because all State courts have a conflict of interest in disfavoring their own institution and employer. This leaves only Federal courts with the possibility for neutrality.

21. Concerns of comity and abstention are not triggered because there is no valid State interest in the use of forged records or in allowing a disqualified adjudicator's decisions to stand (see supra ¶9-18).

### G. Timing and Accrual of Claims

22. Time limits regarding applicable Rights Deprivation / Tort Violations: The shortest relevant Federal limits of time include the use of WI Stats. §893.53 (action


Case 2:26-cv-00028-PP Filed 10/30/26 Page 10 of 52 Document 1

to recover damages for an injury to the character or rights of another, <u>not arising on contract</u>, shall be commenced within 3 years) and §<u>893.57</u> (action to recover damages for… intentional tort to the person shall be commenced within 3 years). However, a marriage is a "civil contract" per §<u>765.01</u>, so longer timelines apply for the dissolution of that contract (exchange for a divorce contract) via §<u>893.43(1)</u> (action upon any contract or obligation… shall be commenced within 6 years).

23. <u>Discovery Rule and Final Act Doctrine</u>: Under the Discovery Rule, a §1983 claim accrues when a plaintiff knows or has reason to know of their injury.

24. <u>Tolled timelines</u>: Appeals of R.127 percolated through the state court system before spending the better part of a year under reviewed by the U.S. Supreme Court, which tolled the timing of not only 26-CV-23's claim deadlines, but this Complaint's claims, which would have been significantly impacted by the U.S. Supreme Court's vacate and remand of R.127 that would have undermined any validity of the May 9, 2025 Order. Under principles of federalism, the full extent of the constitutional injury did not reach finality—and thus the statute of limitations did not begin to accrue—until the conclusion of the appeals process on December 15, 2025 when the U.S. Supreme Court issued its final decision (denying rehearing) of R.127 as "error" (#24-7187). The U.S. Supreme Court Petition began nearly one year earlier and the complaint timelines tolled during this period.

25. <u>All of Plaintiff's claims were timely filed</u>. While R.127 offered a discrete act near the end of the January 6-12, 2023 period, another discrete act occurred May 9, 2025 when Keberlein denied Ordered a Receiver. Despite proactively engaging the Receiver to inform her of the Plaintiff's claim (encumbrance) on the real estate that the Receiver had been ordered to investigate, the Receiver transferred the real estate without additional notice, leaving the Plaintiff to learn of her acts in late December 2025.

26. <u>Continuing Violation</u>: The harms caused by the Defendants during the January 6-12, 2023 event period remain active ("evergreen"), as the Defendants


Case 2:26-cv-02028-PP Filed 10/30/26 Page 11 of 52 Document 1

have continued to misuse and misrepresent R.127 as a valid instrument of the State and deny the divorce trial that would have resulted in a clear asset transfer to witness Elizabeth and trigger Plaintiff's loan repayment and ability to legally marry Elizabeth and become the father-in-law of the Fitzgibbon's son.

27. Even now, Keberlein has yet to disqualify himself as WI statutes require, which not only leaves him ineffective, his unauthorized adjudication leaves the Plaintiff with multiple ongoing harms.

28. Nullity and Fraud upon the Court: Pursuant to *Hazel-Atlas Glass Co. v. Hartford-Empire* Co., 322 U.S. 238 (1944), a judgment obtained through fraud upon the court (R.127) is a wrong against the institutions of justice that can be vacated at any time, particularly because R.127 is subsequently relied upon by unrelated parties (e.g. Social Security Administration, IRS, WI Dept of Revenue, FDIC-insured banks and credit unions, title insurers, police interventions, healthcare providers/payers). Because the January 6-12, 2023 falsified documents (e.g. R.127) are *void ab initio*, they never acquired the legal status necessary to trigger a statute of limitations bar against challenges to their validity. Plaintiff's loan remains unpayable as a result of the Defendants' acts and continues to accrue interest. It is unclear if both Fitzgibbons' assets are even sufficient to cover the loan value that has encompassed a half-dozen attorney fees among other necessary expenses for Elizabeth. Plaintiff never consented to Keberlein's adjudication that now harms the Plaintiff both financially as well as in Plaintiff's diminished personhood (unable to marry Elizabeth, who cannot get properly divorced).

### H. Lost judicial and quasi-judicial immunity

29. "Fraud vitiates every thing…a judgment equally with a contract -- that is, a judgment obtained directly by fraud", *U.S. v. Throckmorton*, 98 U.S. 61, 98 (1878). 21FA564's Judgment with MrSA (R.127) is a forgery that was inspired / induced by, created by, ordered by, wrongly maintained by, used by, and/or enforced by the Defendants to defraud the Plaintiff and in so doing, deny his Constitutional rights.

30. The *Trespasser Doctrine* strips all judicial and quasi-judicial immunity from all officials, court officers, court or county employees, and any other persons (e.g. private parties co-conspiring with State and/or County employees) who act without authority in creating or enforcing false Judgments and Orders, which are legal nullities. All involved in executing R.127 trespass upon the Plaintiff's rights. Per Elliott v. Peirsol, 26 U.S. 328, 25 (1828), with *emphasis added*:

> "Where a court has jurisdiction, it has a right to decide every question which occurs in the cause, and whether its decision be correct or otherwise, its judgment, until reversed, is regarded as binding in every other court. *But if it act without authority, its judgments and orders are regarded as nullities.* They are not voidable, but *simply void, and form no bar to a recovery sought, even prior to a reversal, in opposition to them. They constitute no justification, and all persons concerned in executing such judgments or sentences are considered in law as trespassers.*"

## IV. PARTIES

31. Plaintiff Robert Murray is a natural person residing at 823 E Main St. #A119, Richmond, VA 23219. He is a victim of, the Defendants creation and use of a false divorce contract, governed by "The Family Code" (*see infra* ¶VI. B. ).

32. Persons are sued in one or two capacities, for the respective purposes of:

a. Official Capacity: For obtaining declaratory and injunctive relief to end ongoing violations of federal law (and/or claims against the County);

b. Individual Capacity: For compensatory and punitive damages to remedy acts performed in the clear absence of all authority.

33. Defendant Hon. Bryan D. Keberlein (WISBAR #1061372) is a natural person who, at all relevant times, was a Circuit Court Judge for Winnebago County, WI via the Judiciary Courts of the State of Wisconsin. His official business address is WCC, 415 Jackson Street, Oshkosh, Wisconsin 54901. Herein, he is sued in his Official and Individual capacities.

34. Defendant Stephanie Koenigs is a natural person who, at all relevant times,

was employed as the Court Reporter for (Keberlein's) Branch III of the WCC. Herein, she is sued in her Official and Individual capacities.

35. Defendant Hon. Michael D. Rust (WISBAR #1056017) is a natural person who, at all relevant times, was a Winnebago County Family Court Commissioner who presided over case #21FA564 in support of Keberlein. His official business address is WCC, 415 Jackson Street, Oshkosh, Wisconsin 54901. Herein, he is sued in his Official and Individual capacities.

36. Defendant Hon. Kirsten Navarette (WISBAR #1073957) is a natural person who, at all relevant times, was a Winnebago County Family Court Commissioner who presided over case #21FA564 in support of Keberlein. Her official business address is WCC, 415 Jackson Street, Oshkosh, Wisconsin 54901. Herein, she is sued in his Official and Individual capacities.

37. Defendant Tara Berry (nka. Tara Granditzke) is a natural person who, at all relevant times, was employed as the Clerk of Circuit Court for Winnebago County. Her address is 1211 S. Park Ave., Neenah, WI 54956. Herein, she is sued in her Official and Individual capacities.

38. Defendant Desiree M. Bongers is a natural person who succeeded Tara Berry as the Clerk of Circuit Court for Winnebago County. Her address is 1211 S. Park Ave., Neenah, WI 54956. Herein, she is sued in her Official and Individual capacities.

39. Defendant Missy Woldt (wife of Judge Scott C. Woldt, WISBAR #1011670) is a natural person who, at all relevant times, was employed as a WCC Judicial Assistant assigned to support Keberlein. To avoid publishing her (and thus her husband's presumed) home address, her official business address is WCC, 415 Jackson Street, Oshkosh, Wisconsin 54901. Herein, she is sued in her Official and Individual capacities.

40. Defendant Julie Mabry is a natural person who, at all relevant times, served as Child Support Director for Winnebago County. Her official business address is

WCC, 415 Jackson Street, Oshkosh, Wisconsin 54901. Herein, she is sued in her Official and Individual capacities.

41. Defendant Trista Lee Moffat (WISBAR #1054071) is a natural person who, at all relevant times, served as the Guardian ad Litem for the Fitzgibbons' minor child so is a relevant court officer for the WCC and/or the Judiciary Courts of the State of Wisconsin. Her official business address is Suite #120, 40 Jewelers Park Dr., Neenah, WI 54956. Herein, she is sued in her Official and Individual capacities.

42. Defendant Peter J. Culp (WISBAR #1022595) is a natural person who, at all relevant times, served not only as counsel to Adam Fitzgibbon, but as a court officer for the WCC and/or the Judiciary Courts of the State of Wisconsin. His official business address is 6991 State Road 76, Neenah, WI 54956. Herein, he is sued in his Individual capacities.

43. Defendant Kathleen M. Healy (WISBAR #1045731) is a natural person who, at all relevant times, served as a court-assigned Receiver and as a court officer for the WCC and/or the Judiciary Courts of the State of Wisconsin. Her official business address is 2 Neenah Center, Neenah, WI 54956. Herein, she is sued in her Official and Individual capacities.

44. Defendant Adam Fitzgibbon is a natural person residing at 451 Lowell Place, Neenah, WI 54956. Adam shares with Elizabeth not only a mortgage through an FDIC-insured lender for the home in which he resides, but also shares with Elizabeth a marriage license, granted by the State of WI and exclusively governed by the "Family Code" (*see infra* ¶VI. B. ). Herein, he is sued in his Individual capacity.

45. Defendant Lisa S. Neubauer (WISBAR #1011685) is a natural person who, at all relevant times, was a WI Appellate Court District II justice, who presided over the appeal of case #21FA564. Her official business address was 2727 N. Grandview Blvd., Ste. 300, Waukesha, WI 53188. She has retired.

46. Defendant Maria S. Lazar (WISBAR #1017150) is a natural person who, at


Case 2:26-cv-02028-PP Filed 10/30/26 Page 15 of 52 Document 1

all relevant times, was a WI Appellate Court District II justice, who presided over appeals of case #21FA564. Her official business address was 2727 N. Grandview Blvd., Ste. 300, Waukesha, WI 53188.

47. Defendant Shelley A. Grogan (WISBAR #1018076) is a natural person who, at all relevant times, was a WI Appellate Court District II justice, who presided over appeals of case #21FA564. Her official business address was 2727 N. Grandview Blvd., Ste. 300, Waukesha, WI 53188.

48. Defendant Mark D. Gundrum (WISBAR #1024370) is a natural person who, at all relevant times, was a WI Appellate Court District II justice, who presided over appeals of case #21FA564. His official business address was 2727 N. Grandview Blvd., Ste. 300, Waukesha, WI 53188.

49. Defendant Anthony F. LoCoco is a natural person who, at all relevant times, was a WI Appellate Court District II justice, who presided over appeals of case #21FA564. His official business address was 2727 N. Grandview Blvd., Ste. 300, Waukesha, WI 53188.

50. Defendant Joshua L. Kaul (WISBAR #1067529) is a natural person who, at all relevant times, is the Attorney General for the State of WI. His official business address appears to be both 17 W Main St, Madison, WI 53703 and 114 East State Capitol, Madison, Wisconsin 53707.

51. Defendant Daniel B. Peters (WISBAR #1132126) is a natural person who, at all relevant times, is an attorney serving the Office of the Attorney General for the State of WI. His official business address appears to be both 17 W Main St, Madison, WI 53703 and 114 East State Capitol, Madison, Wisconsin 53707.

52. Defendant Julian M. Marrufo (WISBAR #1122180) is a natural person who, at all relevant times, served as counsel to the WCC employees (e.g. Mabry, Berry, Woldt) and as a court officer for the WCC and/or the Judiciary Courts of the State of Wisconsin. His official business address is 710 N Plankinton Ave, Ste 500, Milwaukee, WI 53203. Herein, he is sued in his Official and Individual capacities.

53. Defendant Anna M. Kees (WISBAR #1073980) is a natural person who, at all relevant times, served as counsel to the WCC employees (e.g. Mabry, Berry, Woldt) and as a court officer for the WCC and/or the Judiciary Courts of the State of Wisconsin. Her official business address is 710 N Plankinton Ave, Ste 500, Milwaukee, WI 53203. Herein, she is sued in her Official and Individual capacities.

54. Defendant Samuel C. Hall, Jr. (WISBAR #1045476) is a natural person who, at all relevant times, served as counsel to the WCC employees (e.g. Mabry, Berry, Woldt) and as a court officer for the WCC and/or the Judiciary Courts of the State of Wisconsin. His official business address is 710 N Plankinton Ave, Ste 500, Milwaukee, WI 53203. Herein, he is sued in his Official and Individual capacities.

55. Defendant Gregory A. Parker (WISBAR #1021721) is a natural person who, at all relevant times, served as State counsel and as a court officer for the Judiciary Courts of the State of Wisconsin. His official business address is 311 North Main St. Shawano, WI 54166. Herein, he is sued in his Official and Individual capacities.

56. Defendant Laura Nelson (WISBAR #1026564) is a natural person who, at all relevant times, served as State counsel and as a court officer for the Judiciary Courts of the State of Wisconsin. Her official business address is 311 North Main St. Shawano, WI 54166. Herein, she is sued in her Official and Individual capacities.

## V. LEGAL FRAMEWORK (U.S. FEDERAL)

57. First, 18 U.S.C. §4 "Misprisionment' reads, "Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both." *U.S. v. Olson* (9th Cir. 2017) further clarified the case law elements include "(1) that the principal . . . committed and completed the felony alleged; (2) that the defendant had full

knowledge of that fact; (3) that he failed to notify the authorities; and (4) that he took affirmative steps to conceal the crime of the principal." citing *Lancey v. U.S.*, 356 F.2d 407, 409 (9th Cir. 1966). Given their legal professions and access to the case's 3,000+ page record, it would be difficult for any Defendant, or their counsel, including the Winnebago Corporate Counsel, the Office of the Attorney General ("**A.G.'s Office**"), or members of the firm Crivello, Nichols & Hall, S.C. and any other court officer to both competently defend themselves and/or their clients while not actively concealing the ongoing forgery and fraud.

58. While this Court is undoubtedly familiar with most U.S. authorities, including U.S. Codes ("**U.S.C.**") and the U.S. Constitution, those most relevant to this case were either already noted (*see supra*, III. Jurisdiction and Venue) or are summarized below. These are intended to support the recurring legal arguments made for each Defendant's specific deprivations, wrongs, or violations.

### A. Defining U.S. "Constitutional Rights" as used herein

59. **Contracts** (U.S. Const. Art 1,§10,c1.7 "No State shall…pass any…Law impairing…Obligation of Contracts"). This applies to State court orders/judgments as well. In *Muhlker v. New York & Harlem R. Co.*, 197 U.S. 544 (1905) the U.S. Supreme Court explained that regardless of what the Defendant's laws and contracts were, that the Defendant must comply with them, so as to honor its contracted and legislated agreement with Muhlker. Similarly, this Court need not care what Wisconsin's domestic relations or contract laws and procedures are, but must ensure that the State and County employees follow them. In this case, Keberlein (and his co-workers/co-conspirators) falsified this case's Judgment (R.127) during the 2023-01-06-12 period, thus usurping Elizabeth's right to contract (reach a voluntary agreement) and thwarting Elizabeth's contract with the State of Wisconsin per her marriage license, by claiming that she (and Adam, and FCC Bermingham) already had contracted/agreed when none of them had. R.127 continues to block Elizabeth's proper divorce, the release of her assets, and her

ability to repay the Plaintiff's loan. By years, Plaintiff's loan superseded Keberlein's May 9, 2025 Order to transfer the loan collateral to Defendant Fitzgibbon. Plaintiff cannot marry Elizabeth until Elizabeth is properly divorced, reducing Plaintiff's personhood.

60. **Ex post facto law** (U.S. Const. Art 1,§10,c1.6 "No State shall…pass any…ex post facto Law"). Similar to Contracts (see *supra* ¶59), State court Orders made to apply retroactively are a form of violating this "ex post facto law" right. Defendants acts attempt to usurp Plaintiff's loan contract, despite Plaintiff's loan pre-dating R.127, which claims to be a recreation of a document made 11 months earlier, though Plaintiff's oral loan pre-dated even that date.

61. **Equal Protection** (U.S. Const. 5th/14th Amendments "[Nor shall any State] deny to any person…the equal protection of the laws."), given that Elizabeth and Plaintiff are members of a small class of citizens whose civil rights to due process (like Richard Glossip in *Glossip v. Oklahoma*, 604 U.S. 226 (2025)) and/or voluntarily contract have been repeatedly denied or impaired by all Defendants.

62. **Due Process** (U.S. Const. 5th/14th Amendments), per the Wisconsin "Family Code" (e.g. Ch. 765-767) that prescribes all relevant processes and limits judicial authority, given the inherent conflict of interest that judges have in both representing the interests of the State of Wisconsin while appearing to act as a neutral adjudicator. This spans both procedural and substantive due process. Plaintiff's rights to due process were usurped by the May 9, 2025 Order and Defendants acts.

63. **Association**. Implied in the Constitution and confirmed in *Loving v. Virginia*, 388 U.S. 1 (1967) and *Obergefell v. Hodges*, 576 U.S. 644 (2015), all Americans are acknowledged to have a right to associate with whomever they wish, specifically noting that marriage is a fundamental human right, and by extension (so as to grant a different marriage), so too is divorce a fundamental human right that may not be impaired. Plaintiff's right to marry Elizabeth is impaired by the


Case 2:26-cv-02028-PP Filed 10/30/26 Page 19 of 52 Document 1

Defendants' coordinated efforts to deny Elizabeth a proper divorce.

64. **Parental Rights**. Implied in the Constitution and repeatedly upheld in the U.S. Supreme Court: parents have a fundamental right to direct the development of their children. This has been clear for over a century by *Meyer v. Nebraska*, 262 U.S. 390 (1923), *Wisconsin v. Yoder*, 406 U.S. 205 (1972), *Troxel v. Granville*, 530 U.S. 57 (2000), and *Mahmoud v. Taylor*, 606 U.S. 522 (2025), et al. Critically, any judgment or Order that usurps parental rights without just cause requires at least a compelling state interest. There can be no compelling state interest in any falsified judgment (R.127) or Order that falsely claims to exist from the authority parents consented and/or delegated to it. Plaintiff lacks a path to *in loco parentis* for the Fitzgibbons' child, as Plaintiff's marriage to Elizabeth remains blocked by R.127.

## VI. LEGAL FRAMEWORK (WISCONSIN)

65. Plaintiff summarizes Wisconsin's Constitution and some key statutes that relate to this case. These summaries are intended to support the recurring legal arguments made for each Defendant's specific deprivations, wrongs, or violations.

### A. Wisconsin judicial operations.

66. The general provisions concerning Wisconsin courts of record, judges, attorneys, and clerks are defined in Chapter 757, including:

67. Mandatory Disqualification (§757.19): All state judges and justices "shall disqualify" under certain situations (e.g. judge/justice (b) is a party or material witness; (c) previously acted as counsel to any party in the action; (d) prepared as counsel any legal instrument or paper whose validity or construction is at issue; (e) has a significant financial or personal interest in the outcome of the matter; (f) appears cannot act in an impartial manner.)

68. Immunity Limitations (§757.94(2)): A presiding judge is immune from civil liability only for conduct "in the course of the person's official duties under §§


Case 2:26-cv-02028-PP Filed 10/30/26 Page 20 of 52 Document 1

757.81 to 757.99." Immunity does not extend to the performance of ministerial duties where the law imposes a duty so positive and defined that it leaves nothing to the officer's discretion (per *Lister v. Bd. of Regents,* 72 Wis.2d 282 (1976)).

69. Verbatim Court Hearing Transcript (§757.57(5)): Court Reporter "shall make a transcript of the verbatim record... duly certified...to be a correct transcript."

70. Clerk of Courts duties (§59.40(2)(a,g,i): "File and keep all papers properly deposited...in every action or proceeding... The papers may be microfilmed or microphotographed, or transferred to optical discs or electronic format if authorized under s. 59.52 (14), and the originals may thereafter be destroyed upon compliance with SCR chapter 72."

71. Court Record Integrity (§757.54): The records of the court must be preserved as a true and accurate memorial of the proceedings. §757.54(1) states: Clerk of Court retention and disposal of all court records and exhibits in any civil ...action or proceeding... shall be determined by the supreme court by rule", which in the relevant period, is Supreme Court Rule ("**SCR**") 72. SCR 72.01(11) requires Family case files (all documents deposited with the clerk) retained for the period relevant to this case (e.g. 40 years). Under SCR 72.01, "Retention of original record... (11) Family case files. All documents deposited with the clerk of circuit court in every proceeding commenced under ch. 767, stats.: (a) 40 years after entry of judgment of divorce... (12) Family court record. A history and index of proceedings: (a) 40 years after entry of judgment of divorce" and "(47) Verbatim record of in-court proceedings. The verbatim record, created as authorized under SCR 71.01 (3): 10 years after the hearing." SCR 72.01 states "A clerk of court...may destroy records after minimum retention periods under SCR 72.01 have expired". SCR 72.03(2), states "Notwithstanding the provisions of SCR 72.01, any record of a court that has been suitably microfilmed may be destroyed... 2 years after entry of final order". Such records include Elizabeth's January 28, 2022 document co-signed by Defendant Fitzgibbon and titled, "Amended Marital Settlement Agreement".

72. Limited Powers of (Family Court) Commissioners (§757.69): Defines limited duties for circuit court commissioners. Specifically, §757.69(1)(p)(1) mandates, "If the circuit court commissioner does not approve an agreement between the parties on material issues, the action shall be certified to the court for trial" by a judge.

73. Relief (§806.07): Specifies terms by which a party or legal representative may gain relief from a judgment, order or stipulation. Such terms include (among others) (1)(a) mistake, (b) newly-discovered evidence, (c) fraud, misrepresentation, misconduct of an adverse party… (h) any other reason justifying relief. The statute is silent on providing remedies or granting powers other than relief (e.g. creating a contract). Per *Neylan v. Vorwald*, 124 Wis.2d 85, 96-98 (1985), while §806.07 "is substantially equivalent to Federal Rule 60(b)", it "presupposes the entry of a valid judgment… *It has nothing whatsoever to do with the vacation of a void judgment.*"

**B. WI Domestic Relations / Family Law and "The Family Code"**

74. §765.001(1) states, "Chapters 765 to 768 may be cited as 'The Family Code'". Most relevant to this Complaint,

a. Ch. 765 creates a judicial power to declare two persons married through state-run marriage licenses.
b. Ch. 766 lists property rights of married persons ("marital property").
c. Ch. 767 defines adjustments to marriages (annulment, divorce, legal separation) of married persons.

75. §765.01 Marriage is "a civil contract, to which the consent of the parties capable in law of contracting is essential, and which creates the legal status of husband and wife." §765.05 adds that the State of Wisconsin is a party to that civil contract, acting as its licensor / grantor per "The Family Code" rules set forth by the State of Wisconsin Legislature. Blacks Law 9th Ed. defines:

> license, n. (15c) 1. A permission, usu. revocable, to commit some act that would otherwise be unlawful;
>
> license fee, n. 1. A monetary charge imposed by a governmental authority for the privilege of pursuing a particular… activity. 2. A

charge of this type accompanied by a requirement that the licensee take some action, or be subjected to regulations or restrictions.

For Wisconsin domestic relations cases (e.g. marriage, separation, divorce), the judiciary acts as the State's agent and/or representative for the State's interests. More specifically, circuit court judges are that counsel in addition to being a paid employee/officer of the State (e.g.. JUDICIARY COURTS OF THE STATE OF WISCONSIN). When adjudicating a divorce, every judge therefore balances dual, competing roles: an adjudicator (judge) of the spouses' dispute and a representative (counsel/attorney) for the State's interest in the marital/divorce contract. This is an inherent conflict of interest, at best kept in check by The Family Code that tightly governs judicial authority and procedure in domestic relations cases (e.g. 21FA564).

76. §765.03(2) states, "It is unlawful…to marry again until …after judgment of divorce is granted". §765.04(1) prevents marriage abroad to circumvent §765.03(2). §765.05 further restricts marriage licenses: "No person may be joined in marriage within this state until a marriage license has been obtained" and §765.09 adds, "No application for a marriage license may be made by persons lawfully married".

77. Critically, WI marriages (and marital dissolutions, known as divorces) are therefore solely born of and constrained to statutory authority. "In a divorce proceeding, a trial court has only that authority given it by statute." *Zawistowski v Zawistowski*, 2002 WI App 86, 253 Wis.2d 630, 644 N.W.2d 252 (WI Ct.App. 2002). Further, "Divorce in Wisconsin is governed by ch. 767, Stats. Jurisdiction of divorce actions is purely statutory, and the authority of the court is confined to those express and incidental powers that are conferred by statute" per *Pettygrove v. Pettygrove*, 132 Wis.2d 456, 393 N.W.2d 116 (1986).

78. §767.201 In any action affecting a family, except as otherwise provided in the Family Code statutes, "chs. 801 to 847 generally govern procedure and practice." These chapters of statutes span Appeals, Writs Of Error, Replevin, Attachment, Garnishment, Injunctions, Ne Exeat, Receivers, Court Costs/Fees, Executions,

Remedies, Arrest, Bail, Personal Property, Certification Of Questions Of Law, Child Custody Jurisdiction And Enforcement, Nuisances, and Real Property Actions.

79. §767.205(2) details how the State of Wisconsin is a real party in interest, despite its prescribed listing exclusion from the §767.205(3) Title of Actions. At the cost of clarity, this statutory exclusion lowers confusion for publications, systems, and most readers, who are accustomed to Part(ies) v. Part(ies) in captions, rather than Spouse1 v. Spouse2 ***v. State3***.

80. §767.34 prescribes the judicial process for granting or declining a stipulated divorce. Critically, there are specific restrictions to a court granting a divorce. For example, on behalf of the State of Wisconsin (marriage licensor), the court must perform a review of the divorcees' proposed stipulated agreement (Marital Settlement Agreement, or "**MSA**") to ensure that it not only satisfies both spouses *at the time of the divorce hearing*, but also the State of Wisconsin's requirements. As such, a judicial official (e.g. Circuit Court Judge or their Court Commissioner) must perform this statutory review on behalf of the State of Wisconsin. In so doing, the judicial officer represents the statutory interests of the untitled party known as the State of Wisconsin, while also acting as the court-assigned "neutral adjudicator" for the divorce case. Critically, consensus is required between the State of Wisconsin (via its representative judicial officer) and both spouses to achieve a "meeting of the minds" of an agreement, and its final written memorialization: a stipulated (or "Default") divorce Judgment with MSA (a tripartite civil contract).

a. Court "approval of such agreements is necessary to uphold the active third-party interests which the state has in divorce cases…the provisions become its own judgment." *Ray v. Ray*, 57 Wis.2d 77,84, 203 N.W.2d 724 (1973).

b. "Marriage is not simply a contract between two parties… state has a special interest…spouses…contract in the shadow of the court" *Button v. Button*, 131 Wis.2d 84,94, 388 N.W.2d 546 (1986).



Case 2:26-cv-00228-PP Filed 01/30/26 Page 24 of 52 Document 1

c. "marriage is a civil contract to which there are three parties: the husband, the wife and the State" *Linneman v. Linneman*, 1 Ill.App.2d 48,50, 116 N.E.2d 182 (1954).

81. Local court rules further specify stipulated divorce hearing procedures with Court Commissioners and Judges. This includes the process by which court officers agree to conduct and achieve a stipulated divorce and a divorce by trial (e.g. §767.35), when a three-party "meeting of the minds" agreement cannot be reached and a trial is required by statute to complete a non-stipulated (contested) divorce.

**C. Limits of immunity granted by the State of Wisconsin**

82. §893.80 (titled "Claims against governmental bodies or officers, agents or employees; notice of injury; limitation of damages and suits") generally grants these entities' immunity from civil liability. Notably, it is excluded from The Family Code and all relevant portions of the otherwise generally applicable Chs. 801 to 847, undoubtedly because of the State of Wisconsin and its judicial officer representation as an adversarial party in its marriage license scheme.

## VII. STATEMENT OF FACTS

83. Around October 2021, as a friend of the Fitzgibbon family, Plaintiff extended a loan on oral terms to Elizabeth Fitzgibbon to aid at least her separation (and likely divorce) from Defendant Fitzgibbon. This followed Defendant Fitzgibbon chasing her from her home, screaming profanities, and throwing things at her, imperiling her safety. This had happened before (e.g. domestic violence police report) and would repeat later as well. Elizabeth felt she needed limited funds for living necessities, as her part time job paid sub-poverty income. Plaintiff knew the Fitzgibbons' assets far exceeded the nominal amount that Elizabeth sought and that should they remain married, both Elizabeth's and Adam's assets would easily suffice for repaying Plaintiff's loan.

84. In early 2022, various employees and officers of the Winnebago County Court located at 415 Jackson St, Oshkosh, WI 54901 and the JUDICIARY COURTS OF THE STATE OF WISCONSIN (beginning with its County of Winnebago Branch 3). those employees, officers, and entities (presumably) accidentally lost and destroyed documents critical to the Plaintiff, among others (e.g. witness Elizabeth Fitzgibbon, creditors, FDIC-insured financial institutions, and multiple agencies within both the State of Wisconsin and U.S. governments). Likely to conceal records retentions liabilities and punish Elizabeth for refusing to consent to the court's "fix" of its early 2022 errors and eventual wrongs (among other reasons), the Defendants' actions aided/abetted/induced, created, used, and enforced falsified official court records in various ways, doing so in the absence of all jurisdiction, authority, ethics, or equity.

85. For brevity, all "Statements of Fact" within Elizabeth's parallel WIED cases (26-CV-23, 26-CV-625, 26-CV-1376) are to be incorporated herein, as well as the Plaintiff's facts presented in prior sections of this Complaint (e.g. from Preliminary Statement through Legal Framework Sections II. – VI. ). To the extent conflicts or ambiguities arise between facts, this Complaint governs as it represents the Plaintiff's best knowledge and evidence.

86. When Elizabeth entered into a marriage contract with Adam and the State of Wisconsin, she did so with the expectation that the State, County, and Courts would adhere to their own statutory obligations—specifically the laws governing the lawful sustainment of her marriage license contract and (if needed) a lawful dissolution of that marriage within a reasonable time period, as well as adherence to the statutes governing proper WI civil procedure (e.g. judicial disqualification).

### A. WCC's loss and destruction of the Fitzgibbon's MSA

87. On January 7, 2022, Elizabeth submitted a "Marital Settlement Agreement" (**MSA**) to the Winnebago County Court (**WCC**), which was filed January 21, 2022 (R.15) in #21FA564. Elizabeth and Adam had co-signed the MSA's terms for use as a proposal to that court by which to grant and govern their divorce. After additional


Case 2:26-cv-02028-PP Filed 10/30/26 Page 26 of 52 Document 1

due diligence, Elizabeth discussed with Defendant Adam some of R.15's inequitable terms. Adam assaulted Elizabeth, chased her from their shared 451 Lowell Pl. home in a recording made for her safety, given Adam's violent history that had led to Elizabeth's 2021 divorce petition. Elizabeth chose not to prosecute.

88. On January 28, 2022 Elizabeth filed with the WCC all copies of the Amended MSA that she and Adam had managed to co-create, apparently at 4:30AM that morning. This hand-edited Amended MSA replaced and voided the original MSA upon its filing.

89. On February 7, 2022 an improper divorce occurred. Unknowingly, FCC John Bermingham used the original, voided MSA to "divorce" Adam and Elizabeth, who were unaware that FCC Bermingham was not using the January 28, 2022 Amended MSA during the hearing. This error was discovered weeks later when the Clerk of Courts, Tara Berry (nka. Tara Granditzke). The January 28, 2022 Amended MSA had been lost and destroyed prior to FCC Bermingham ever being aware of its existence.

90. On April 20, 2022, Adam motioned the court to correct the Original Judgment with MSA (R.19) by supplementing (from Elizabeth's prior counsel) the Original MSA (R.15) with copies of two "missing pages" so that Adam could use the complete document to begin using and enforcing the invalid (erroneously declared) Judgment to Elizabeth's harm and without her consent. Adam's mortgage lender and/or title insurer had refused the Original Judgment (R.19) due to these two "missing pages".

91. On April 26, 2022, the FCC convened with Adam, Peter Culp (Adam's newly retained counsel) and Elizabeth (pro se) to determine how to properly divorce Adam and Elizabeth. Adam and Elizabeth stipulated (and the FCC ordered their agreement) to create a new, "reconfigured" MSA and schedule a new stipulated/uncontested/Default Divorce. FCC Bermingham had reviewed the recording of the February 7, 2022 hearing, which had confirmed that Adam and Elizabeth had stipulated to only a few specific custodial terms (e.g. $765/month child support, joint legal custody, 60%/40% placement of their son (A.J.F.) with Elizabeth/Adam respectively, etc.), so with Adam's

and Elizabeth's stipulation, FCC Bermingham temporarily ordered these custodial terms and those found within R.19 until a new, proper divorce and valid MSA could be achieved. This April 26, 2022 Agreement and Order would become critical in the months and years to come.

92. However, rather than act in good faith, Adam insisted on financial and custodial terms that were unacceptable to Elizabeth in January 2022 and excluded from the January 28, 2022 MSA. Adam resisted all of Elizabeth's efforts to reach a new MSA, leaving the parties empty handed on the eve of their new May 23, 2022 Default Divorce hearing. So, Adam requested (by way of Culp), and Elizabeth and the WCC approved, a ~60 day adjournment of the hearing, which the court scheduled for July 25, 2022 (before the court *sua sponte* rescheduled the divorce hearing for September 9, 2022).

93. Meanwhile, Adam withheld from Elizabeth all child support and asset access to pressure her concession of various financial and custodial terms into the new Marital Settlement Agreement to propose to the court for the court's statutory review. Due to Adam's withholding funds, Elizabeth's declining liquidity, and Elizabeth's wise decision to hire an attorney, Plaintiff extended his loan amount and terms, putting the document in writing and both signed the terms that incorporated the oral loan.

94. By June 22, 2022, custodial disputes had already risen and were difficult to solve, given the uncertainties within the divorce case's record (e.g. terms of destroyed Amended MSA). These disputes were amplified that afternoon by Adam's and his parents' (Paul and Sally Fitzgibbon of 512 E Peckham St, Neenah, WI 54956) unauthorized taking of A.J.F. (then age 6) from Adam's and Elizabeth's court-approved stipulations for A.J.F.'s placement and then "kidnapping"/withholding A.J.F. (R.19:5, §948.31 "Interference with custody by parent or others" regarded as one or more WI felonies, either Class F or I)(R.43)(R.59) with the assistance of Terry Adler of W4864 Forest Lane, Sherwood, WI 54169), alienating A.J.F. from his mother, neglecting A.J.F.'s care, and in so doing, abusing A.J.F. for 79 days leading up to the September 9, 2022 hearing. Adam termed this period the "Wild West", where Adam, with Culp's

guidance, sought to keep A.J.F. and all assets for himself to punish Elizabeth and to weaken her resolve in negotiating their new divorce (e.g. in email just before the September 9, 2022 hearing, Adam emailed his requirement of financial concessions to restore A.J.F.'s placement with her or face expensive, prolonged litigation that Adam knew Elizabeth could not afford, then Adam and Culp sought to adjourn the September 9, 2022 hearing to exasperate the problems that they had caused). (Months later, Adam explained his predatory behavior to A.J.F.'s court-ordered child reunification therapist, stating Adam acted "because he knew there was no court order", courtesy of Culp's sage counsel.)

95. On September 9, 2022, FCC (then, but now a WCC Judge) Michael D. Rust (WISBAR #1056017) presided over the hearing, having replaced FCC Bermingham, who had retired three months earlier. Recognizing the barrage of custodial and MSA-related motions, FCC Rust would issue logical and lawful temporary court orders immediately restoring A.J.F.'s placement with Elizabeth and routing the backlog of divorce judgment decision-making to Hon. Judge Bryan D. Keberlein. That day, Keberlein was assigned to 21FA564, replacing the Hon. Judge Barbara Key, who had retired around the time of FCC Bermingham.

96. In October 2022, Adam and his parents §948.31 "kidnapped" A.J.F. once again, requiring police intervention for Elizabeth to restore A.J.F.'s court-ordered placement. During this event, Paul threatened the police, Paul exclaimed to the police that he would kill the Plaintiff (now Elizabeth's boyfriend), and Sally and Adam lied to the police, as documented in Neenah Police incident report #22-018879.

97. Adam further violated his agreements with Elizabeth, and September 9, 2022 court orders, by not only failing to take A.J.F. to court-ordered attend mental/emotional therapy (to treat A.J.F.'s adverse childhood experiences, e,g., his 79-day withholding from Elizabeth), but also obstructing all other caretakers (including Elizabeth) from taking A.J.F. to therapy. Adam had claimed the therapists were biased against Adam and Adam unilaterally decided that A.J.F. didn't need counseling.

## B. Falsification of a Divorce Judgement and M.S.A. (R.127)

98. On November 16, 2022, newly assigned Keberlein met with Adam and Elizabeth. At Adam's counsel's request, the hearing was downgraded from addressing Elizabeth's §806.07 Motion to a status conference. Judge Keberlein acknowledged the extraordinary nature of the case and ordered a new timeline: the parties were to exchange a list of MSA issues by November 30, 2022, complete depositions on December 7, 2022 to clarify positions, and return for a follow-up conference on December 20, 2022. Acknowledging that there was no valid divorce Judgment, Keberlein held open the option for a contested divorce trial, emphasizing his preference for Elizabeth and Adam to reach an agreement for their desired stipulated divorce, stating, "there's a lot of power in the parties coming up with their own agreement… as opposed to the Court cutting things in half with a chainsaw."

99. Afterward Adam and Culp complied with their November 16, 2022 court-approved stipulation to detail for Keberlein the "issues" associated with the case, specifically between (R.19)'s invalid Judgment and the parties expectations for what should have been a valid Judgment. Ignoring the past seven months since the April 26, 2022 conference with FCC Bermingham, Adam and Culp returned to Adam's pre-April 26, 2022 position (R.27, thus wavering) by claiming (via R.93) that a valid divorce must exist and that due process had been satisfied by FCC Bermingham. On December 19, 2022 Adam filed notice with the WCC resuscitating his claim that Elizabeth was withholding materials ("missing pages") to the original MSA, which were never relevant, as all had even agreed on April 26, 2022. Fearing consequences for his actions and losing negotiating power, Adam seemingly grew insane, distributing text messages with Elizabeth's face replaced with a "skull and crossbones" and sending Elizabeth scores of emails, even citing §767.44—the law governing child placement in cases after one parent kills the other parent. (Comically, Elizabeth had provided these "missing pages" to the WCC and Adam (thus Culp) on April 11, 2022 (R.22).) In turn,


Case 2:26-cv-02028-PP Filed 10/30/26 Page 30 of 52 Document 1

Elizabeth filed a Motion for A.J.F.'s sole custody, as A.J.F., now age 7, had been traumatized by his paternal family's errant and alienating behavior and A.J.F.'s witness of Adam's unbridled violence that had prompted Elizabeth's desire for divorce. FCC Rust adjourned Elizabeth's Motion for sole custody until after the January 6, 2023 hearing, so as to benefit from Keberlein's perspective and path forward to resolving the destroyed January 28, 2022 MSA and still pending divorce.

100. On December 20, 2022, Judge Keberlein and the Fitzgibbons convened for their status conference. Perhaps as the result of an apparent ex-parte text-message exchange with Adam, which they discussed on transcript (R.137:16), Judge Keberlein refrained from compelling Adam's cooperation, such as approving Elizabeth's §806.07 motion and scheduling a §767.35-compliant contested divorce.

101. Instead, while discussing the February 7, 2022 hearing, Judge Keberlein stated, "there may be some confusion…about it, but I think you agreed to something. The question for me to determine is what" (R.137:3¶6). Only Judge Keberlein understood his intentions or how his thinking had shifted since November 16. This was because what Judge Keberlein sought was readily found in the transcript of the February 7, 2022 hearing (R.69), which had already been incorporated in the April 26 Agreement/Order (R.32). Since no one at the court ever saw/approved the January 28, 2022 proposed MSA, anything absent from the February 7, 2022 hearing's transcript (R.69) of custodial agreements was irrelevant. Since the February 7, 2022 discussed no asset division specifics, it utterly failed to divide the Fitzgibbons' assets, much less do so in a manner compliant with §757.69(1)(p)(1) and §767.34-35, among other statutory constraints.

102. By statute and agreement, since April 26, 2022 the court still owed the Fitzgibbons the court's review/approval of a new MSA and a proper stipulated divorce (or contested trial). The Fitzgibbons' adjourned September 9, 2022 Default Divorce hearing still remained pending, but Adam's eight months of obstruction signaled the need for a contested divorce trial to defeat "Adam holding hostage"


Case 2:26-cv-02028-PP Filed 10/30/26 Page 31 of 52 Document 1

A.J.F., Elizabeth, and court (as noted, R.692:21¶16). Adam's non-cooperation wasn't just Elizabeth's and A.J.F.'s problem, but the court's, with its growing records retention liability for "destroying" (R.136:7¶25-8¶7) the Fitzgibbons' January 28, 2022 MSA.

103. In an abrupt pivot, Judge Keberlein used his erroneous procedural history to assert that FCC Bermingham had successfully divorced Elizabeth and Adam (R.30's second divorce hearing for May 23 clearly refued Judge Keberlein's claim). Judge Keberlein also declared the FCC had ordered the parties to "reconstruct" the lost MSA and again, R.32 ("Parties have 10 days to file re-configured MSA") clearly refutes Judge Keberlein's claim. For these reasons among others, the record is clear that the FCC had explicitly declared the January 28, 2022 MSA irretrievable and irreproducible and ordered a new MSA and divorce to comply with statute and Adam's and Elizabeth's stipulation to do so.

104. Judge Keberlein then ordered both Fitzgibbons to file by December 31, 2022 what they "believed" the lost MSA had included. He explained that he would review these "beliefs" on January 6, 2023, take testimony, and recreate the lost MSA.

105. On January 5, 2023, one day before the hearing, Adam re-agreed to cooperate in creating a new MSA, just as had happened on January 28, 2022 when Adam last faced a trial. Elizabeth's attorney notified the court of the stipulation, requesting an adjournment. Judge Keberlein denied the request, re-demanding that the next day, Adam and Elizabeth would re-create the lost MSA.

106. On January 6, 2023, Judge Keberlein proceeded as he had discussed. Adam was sworn in to "reconstruct" the lost MSA from "memory"—the same memory that he had sworn that he could not replicate the MSA on April 26 and November 16, 2022. Adam gave an edited, self-serving draft to Judge Keberlein.

107. When Elizabeth was ordered to do likewise, she repeated her prior testimony that she could not accurately recall the specific terms negotiated under distress at 4:30AM on January 28, 2022. Unlike Adam, Elizabeth claimed no specific asset

division terms, but testified to her timely filed materials (R.116)(R.118) for the hearing, including a summarized, but otherwise complete financial basis (R.139:19, "Exhibit-G") that matched what she'd used in preparation for the January 28, 2022 MSA negotiation, so while the precise configuration of asset division was unknown to her, the total assets were not. Unlike Adam, Elizabeth remained consistent with all prior sworn statements and materials. Elizabeth's attorney added:

> [Elizabeth is] being honest in every assertion she's made…Both parties in the record of this case have stated they don't recall [the terms of the lost MSA], including Mr. Fitzgibbon… that's part of the record… I don't know how we can…force terms on them when they both have said earlier they don't recall… How do you… say with any degree of certainty these are the terms, but yet I didn't recall them earlier without perjuring yourself?

108. Judge Keberlein remained dismissive. Despite Adam's incredible testimony contradicting the materials he'd filed even days earlier, and both his testimony/filings conflicted with Adam's historical claims, Judge Keberlein found him to be more credible and Elizabeth's never wavering, fact-based discussions to be less credible.

109. Judge Keberlein created his own terms, but in doing so, Judge Keberlein painstakingly ignored the only basis of fact (R.139:19, "Exhibit-G"), which was offered by Elizabeth, her Attorney, and even Judge Keberlein's assistant, Missy Woldt (R.135:18¶10,18¶19-21,33¶9-18,35¶2-25,44¶2-5). The transcript reveals this was not an oversight, but a calculated administrative suppression:

> Missy Woldt, "Do you want me to pull and mark Exhibit G, Judge?"
> Judge Keberlein, [No answer] ...
> Missy Woldt, "We have filed exhibits, but until they're marked and offered, they're just sitting in a queue that you cannot see."
> Judge Keberlein, "That's okay. I don't need to right now."
> Missy Woldt, "And then I'm going to just reject all of these exhibits since none of them were offered or received, correct?"
> Judge Keberlein, "Okay."

110. With a single word—"Okay"— Judge Keberlein summarily excluded the one

basis of truth capable of exposing the financial inaccuracies within Adam's claims. By refusing to review this basis of fact or seek to reconcile Adam's claims against it or even the original (and outdated) Financial Disclosure Statements (R.12-13), Judge Keberlein ensured the MSA would remain unverifiable, permanently impairing due process procedural fairness or validate Elizabeth's credibility. Even so, Elizabeth recited portions for the record (R.135:36¶5-18).

111. Ignoring Elizabeth, Judge Keberlein stated, "I'm going to create what is the MSA that I think they agreed to" and then simply authored his own terms ("I'm going [to] change…#4 to…what I think"; "I'm going to eliminate...") (R.135:43), which oddly conflicted with both Fitzgibbons' irreconcilable testimony/affidavits. Paradoxically, Judge Keberlein exalted mundane/outdated terms (R.135:41¶3-15) for being either precisely rounded ($77,000) or precisely specific ($106,187), failing to understand their genesis, age, validity, or negotiated evolution. Judge Keberlein re-confirmed the court's negligence liability (e.g. R.135:81¶19-23), but denied Elizabeth's Motion to void (§806.07) or even declare void the divorce (R.39-40) via §806.04. Instead, Judge Keberlein claimed to use only §806.07(1)(h) and unspecified "contract law" (R.135:48¶1-8,49¶1-4) as his authority to solely author his own proposed, marriage-terminating written instrument/contract parapraxically "in favor of Adam" (R.135:41¶24), his apparent texting partner (R.137:16¶5-12). Judge Keberlein seemingly relied on aligning with Adam's off-record MSAs (R.137:16¶6) and justified ignoring Elizabeth's due process by rhetorically asking her counsel about Judge Keberlein's new terms, "Is it a fair, accurate representation of your agreement? …How can they say it's not?" (R.135:23). Despite Elizabeth explicitly saying "it's not," Judge Keberlein proceeded to declare he was "not forcing terms on them" while doing exactly that.

112. In elevating Adam's contradictory claims over all documentary evidence—and over Elizabeth's testimony, which had remained consistent since February 7, 2022—Judge Keberlein had inverted the concept of credibility. The only party

(Adam) whose account had shifted repeatedly and strategically became the "reliable" one, while the only party (Elizabeth) whose testimony never changed was sidelined. Even then, Judge Keberlein only partially leveraged the least credible participant in the room, while fashioning Judge Keberlein's own unique MSA terms.

113. Concluding the hearing with less clarity or certainty than it had begun, Judge Keberlein claimed "the parties…memorialization of that agreement…is what I accomplished today" (R.135:48¶19-24), seemingly referring to the Fitzgibbons' January 28, 2022 proposed MSA that remained pending at least the court's approval and still open to negotiation until all three parties, including the court, had agreed to it. Judge Keberlein sought no agreement and concluded the hearing.

114. The Fitzgibbons never agreed to Judge Keberlein's January 6, 2023 *proposed* MSA terms. Equally, no court officer ever reviewed/approved Keberlein's *proposed* MSA terms on Wisconsin's behalf as statutes require (e.g. §767.34), so upon the hearing's conclusion, Judge Keberlein's work merely remained an oral, unwritten, unapproved proposal.

115. Four days later, Keberlein drafted an MSA (R.120), then sua sponte refined/filed his work again, calling it his "Third Amended Ma**rti**al [sic] Settlement Agreement" (**MrSA**)(R.126). MrSA's final page (R.126:10) excludes all approval signatures: neither Fitzgibbon's, nor the court's (e.g. FCC Bermingham's), nor others on behalf of the State of Wisconsin's various agencies (e.g. R.19:16, CSA's "Devin Suess"). Instead, MrSA features only Judge Keberlein's first-page electronic signature, which fulfills only the administrative filing identifier requirement, not a judicial review and approval of the MrSA's contents as statute-defined requirements for a divorce (e.g. §767.34) required. Instead, the note on MrSA's final page reads, "As ordered by the Court to reconstruct the Marital Settlement Agreement that was lost after filing with the Clerk of Courts" (R.126:10). Further, the altogether different document title confirms that it is not the Fitzgibbons' January 28, 2022 [First] "Amended Martial Settlement Agreement", but was Judge

Keberlein's now <u>written, unapproved proposal</u>.

116. However, Judge Keberlein had a problem: he had failed to request, much less gain the Fitzgibbons' approvals for either the MrSA. Elizabeth wasn't interested.

117. Worse, Judge Keberlein knew (R.136:16) that FCC Bermingham had retired seven months before Judge Keberlein even authored the MrSA (R.126) that Judge Keberlein claimed the FCC had approved eleven months earlier. In other words, it was impossible and without any authority that the FCC had post-retirement validated Judge Keberlein's MrSA, particularly since the FCC had never pre-retirement reviewed or approved the lost January 28, 2022 MSA that Judge Keberlein's MrSA purports to have reconstructed. This invalidated Judge Keberlein's MrSA (R.126) for any purpose beyond being a proposal.

118. So, for his MrSA to serve any purpose at all, Judge Keberlein needed to falsify a new Findings of Fact, Conclusions of Law, Judgment (**FFCLJ**) of divorce and incorporate the MrSA, claiming that the Fitzgibbons and the FCC had all approved of Judge Keberlein's MrSA at the time of the original divorce hearing, February 7, 2022, some eleven months earlier. This formed the Judgment with MSA (R.127), which claims to have been approved by those who never provided their approvals, with new terms (made obvious by Judge Keberlein's own decisions), and at a prior date, which is not only wrong, but ignores that the court repeatedly scheduled a new divorce hearings, recognizing no divorce ever took place. In summary, R.127 is a forgery. By ordering R.127 and its enforcement, rather than seeking the Fitzgibbons' approvals, Judge Keberlein sought to defraud at least Elizabeth. Bypassing the statutory requirements of a divorce (e.g. §767.35), Judge Keberlein lacked any authority to falsify a the R.127 divorce contract.

119. Noteworthy:

a. Before a court approves a FFCLJ from a stipulated, Default Divorce,


Case 2:26-cv-02028-PP Filed 10/30/26 Page 36 of 52 Document 1

FA-4160V**A-B** requires the *Petitioner*[2] (herein, Elizabeth) to complete both parts, just as Elizabeth did eleven months earlier in FA-4160V**A**: "1/28/22" "Amended MSA" (R.18:4), and FA-4160V**B** (R.17:1). Because Elizabeth was unwilling to create and file FA-4160V**A-B** for terms she didn't agree to and for no valid divorce hearing, Judge Keberlein and his staff (e.g. Missy Woldt), falsified FA-4160V**A-B** as well, leaving casual readers to assume Elizabeth had filed them.

b. Before learning that the February 7, 2022 hearing had used the voided, replaced MSA (R.15), only Elizabeth ever signed FA-4160V**A-B**, as by February 16, 2022, Adam had already broken the February 7, 2022 agreement (R.39:2¶9-11) and chose to obstinately withheld his FFCLJ approval.

120. Days later, Lawrence G. Vesely (WISBAR # 1014713), Plaintiff's counsel with ~40 years of experience, signed and filed a 27-page Motion for Reconsideration, citing manifest errors or fact and law (R.139:3¶6):

> "The Court's attempt on January 6, 2023 to force an agreement runs totally contrary to the fact that this divorce was granted as a stipulated divorce. If the parties did not have a stipulation, the family court commissioner does not have the power to divorce the parties."
>
> "The trial Court's decision to force a settlement deprives the parties the opportunity to have a full contested hearing. This deprives them of their due process rights under both the U.S. Constitution and the Wisconsin Constitution."

121. Keberlein ignored the Motion for Reconsideration, allowing its automatic denial by operation of law due to the passage of time without court response.

122. Undoubtedly to Judge Keberlein's chagrin, not only did Elizabeth claim Judge Keberlein's MrSA was inaccurate and unapproved, thus invalid, Adam did so

---

[2] Page 1: https://web.archive.org/web/20221129232258/https://www.wicourts.gov/formdisplay/FA-4160As_summary.pdf?formNumber=FA-4160As&formType=Summary&formatId=2&language=en (as of 25-8-20)



Case 2:26-cv-02028-PP Filed 10/30/26 Page 37 of 52 Document 1

as well on multiple occasions and on the court record. For example, Adam claimed (R.203:1) that he had lost $12k-$15k from Judge Keberlein's R.127. In so doing, Adam admitted R.127 was inaccurate and unapproved, thus invalid, just as Elizabeth had, though Adam and Elizabeth obviously differed in their views of who lost and by how much.

123. For the next several years, Elizabeth appealed (R.127). The Wisconsin Appellate Court District II affirmed R.127 after ignoring case facts, case law, and the plain statutory requirements of Wisconsin divorces. For example, the Appellate Court ignored the Appeal Brief's cited temporal impossibility: FCC Bermingham—the official who purportedly authorized the 2022 divorce via the MrSA created in 2023—had retired and surrendered his BAR license 6-7 months before the R.120-R.127 documents he was claimed to have "approved" even existed. (During a 2025 interview, John Bermingham further confirmed that he had no knowledge of being in any way involved or approving any Winnebago Court document after he retired.) Instead, the Appellate Court applied inapplicable case law (e.g. a neutral adjudicator resolving two party commercial contracts as the parties' request, not a three party divorce contract with Chapter 767 guardrails and against the parties' requests).

124. Both Supreme Court of Wisconsin and the U.S. Supreme Court denied certiorari, with the latter concluding the appellate process on December 15, 2025, thus leaving R.127's "errors" undisturbed, ripe for adjudication to begin all over again for torts and crimes based on the Defendants' forgery, fraud, and deprivation of Elizabeth's rights.

**C. Wrongful enforcement of the forged Judgment (R.127)**

125. Elizabeth's dispute of the forged Judgement with MSA quickly spread. Legal bills from their meetings evidence that Elizabeth and her counsel spoke with Moffat at significant length about the unjust approach to falsifying the divorce as well as the risks to A.J.F., but Moffat discarded these concerns and elected to support using the court's falsified Judgment (R.127) as the foundation for her work and A.J.F.'s custodial terms.

126. On January 26, 2023, Elizabeth's Motion for sole custody (one of five parallel

custody-related Motions) was to be finally heard by FCC Rust, whose court records confirmed rumors that he was simultaneously battling his own acrid divorce initiated by his wife, Attorney Angela Marie Rust (WISBAR# 10520282). FCC Rust's behavior had entirely flipped from that which he had exhibited on September 9, 2022, when he had denounced Adam's uncooperative behavior, nonsensical Motion seeking Elizabeth's sanctions, and for harming A.J.F. through Adam's latest withholding period of 79 days. Now, FCC Rust invested less than 60 seconds in reviewing Elizabeth's Motion for sole custody prior to denying it. Further, FCC Rust mysteriously awarded Adam custodial benefits that paralleled the financial windfall Adam had gained during the falsification of the Judgment with MSA, some three weeks prior. Elizabeth promptly filed for a de novo trial of the January 26, 2023 hearing, set for April 13, 2023.

127. Preceding the April 13, 2023 hearing, Elizabeth had repeatedly disputed the forged Judgment with MSA (R.127). Beyond her Motion for Reconsideration (R.139), she filed a Motion for Declaratory Relief from R.127 (February 16, 2023, R.146-147), a Motion to Stay R.127 pending an Appeal (April 10, 2023, R.175-177), and an Appeal of R.127 (also April 10, 2023, R.180-183) to Wisconsin's Appellate Court District II, featuring the Hon. Justices Maria Lazar (WISBAR # 1017150), Shelley Grogan (WISBAR # 1018076), and Lisa Neubauer (WISBAR # 1011685).

128. On April 13, 2023, the de novo trial convened. From the outset, confusion reigned, as the transcript well evidences Keberlein confirmed that the Motion for Reconsideration (R.139), seeking to void the falsified R.127 Judgment with MSA had been denied. Keberlein explicitly acknowledged Elizabeth's April 10, 2023 "Notice of Appeal" had escalated her dispute of R.127. Elizabeth's Motion for Declaratory Relief from R.127 (R.146-147) was also on track for a late May 2023 trial. Regardless, Keberlein clearly intended to preside over the hearing, rather than recuse/disqualify himself from it, despite the dispute over the financial instrument (R.127) that Keberlein had created (with the help of the WIED 26-CV-23 case Defendants' help). Such actions opposed Keberlein's obligation to disqualify himself (*see supra* ¶66 and ¶67, et al.).

129. Elizabeth's counsel immediately called for a recess to determine how to respond to Keberlein's presence, and on what basis they could proceed with a hearing. Elizabeth (with her counsel's wisdom) chose to ignore the falsified Judgment with MSA (R.127) and seek to honor the April 26, 2022 Agreement and oral Order to temporarily use the custodial terms from the voided February 7, 2022 divorce, which largely mirrored those terms within R.127. Even so, Elizabeth would not consent to Keberlein's ongoing role.

130. The hearing proceeded for one critical reason: duress. Elizabeth had no reasonable alternative. At best, Elizabeth's Appeal would require more than a month of preparation and a six month accelerated decision from the WI District II Appellate Court to vacate R.127 and remand for a proper divorce. At worst, Elizabeth was warned that R.127's resolution may take years. However, A.J.F. was being harmed, needed help, and could not wait months (or years) for appeal processes to establish a firm custodial foundation from which to remedy his paternal family's behaviors. As such, under duress and before a clearly hostile court, Elizabeth proceeded with the April 13, 2023 hearing in hopes of achieving some relief or remedy for A.J.F.

131. Surprisingly (at least at the time, as explained in 26-CV-625), Keberlein denied finding Adam in contempt, despite Adam's explicit admission of seven months of Adam's violations that remained ongoing. Keberlein concluded that Adam had only been "negligent" and there was no need to compel Adam's compliance, given Elizabeth's temporary fulfillment of Adam's court-ordered obligations solely for A.J.F.'s benefit.

132. This was Adam's third court-ordered Keberlein-granted windfall in as many months. Specifically, Keberlein neither aided A.J.F.'s well-being, nor upheld Elizabeth's parental or custodial rights and Elizabeth lost a year of her income in un-awarded legal fees in A.J.F.'s and her own defense. Elizabeth was now de facto responsible for A.J.F.'s counseling on her own time and expense (e.g. lost wages). As she predicted at the time, this would become an increasingly maternally-alienating experience for A.J.F., as Keberlein had created disparities between parental households: A.J.F. could play video games with Adam while enduring challenging discussions with court-ordered therapists

while with Elizabeth.

133. Note: the therapist court-ordered for A.J.F. to attend (on September 9, 2022) grew frustrated with Adam's non-cooperation and lies and had ended his service to A.J.F. All three new January 26, 2023 court-selected therapists, court-ordered to benefit A.J.F., would eventually quit in frustration for similar reasons. A.J.F.'s last seen therapist best explained that until Keberlein held Adam accountable for Adam's actions, A.J.F.'s desperately needed therapy was contraindicated by not merely Adam's and his parents' ongoing alienating behaviors, but Keberlein's shielding of Adam, the man who had conspired with Keberlein and other Defendants to create the falsified Judgment with MSA (R.127) and subsequently enforce it to benefit themselves.

134. Keberlein's May 11, 2023 denial of Elizabeth's Motion for Reconsideration unjustly ordered research and explanations to remedy the court's own April 13, 2023 docketing and adjudication errors at Elizabeth's additional expense. For example, the April 13, 2023 hearing failed to docket several de novo'd Motions, prompting Keberlein's denial of fault. Two of the January 26, 2023 Motions, one being Elizabeth's for sole custody, were never heard de novo and one was never even scheduled. This is despite costing Elizabeth's thousands of dollars to document why they were proper for hearing.

135. Further, Keberlein's May 11, 2023 denial *sua sponte* imposed new procedures that created hurdles that inhibited Elizabeth from resolving disputes, including litigation form and page count. Yet Keberlein permitted Adam's disregard of these procedures, even after being explicitly notified of Adam's ongoing violations (R.302). Adam filed more than a dozen non-compliant materials of nearly 100 pages, largely filled with misinformation and misrepresentations similar to those Adam filed in 26-CV-23 (e.g. Dkt. 20 "Statement of Facts", shown to be entirely inaccurate via Elizabeth's Dkt. 31¶12-19), thus imposing overwhelming demands on Elizabeth to defend truth with timely, responsive evidence, now constrained by Keberlein. These procedures remain in effect, but were never enforced against Adam, thus creating a



Case 2:26-cv-02028-PP Filed 10/30/26 Page 41 of 52 Document 1

form of asymmetric lawfare.

136. The April 13, 2023 hearing had been the first of many that would demonstrate Keberlein's refusal to disqualify himself (even when explicitly pressed in Motions) and instead maintain unjust control of the case. Keberlein had demonstrated overt bias against Elizabeth, favoritism of Adam, and cooperation with all other Defendants listed in this Complaint to deprive Elizabeth of her due process rights, including a neutral adjudicator that Wisconsin statutes and jurisprudence require. This harms would become increasingly more obvious as interactions continued with the Defendants, which subsequent complaints will review, each with their own nuances and improprieties.

**D. Further wrongful enforcement of the forged Judgment (R.127)**

137. Following Elizabeth's documented contest of the January 6-12, 2023 documents (e.g. R.127) (*see supra* ¶125), an array of litigation began. First, Elizabeth filed a second Motion for Relief and Declaratory Order (R.146-147) against Adam, whose "testimony" (R.146) before noting,

> "The Court's ordered amended Judgment and Third Amended MSA on January 12 (CCAP #127) is therefore inequitable in its financial distribution and invalid.
> [Adam's] testimony conflicted with his submissions…11 days prior [and…] revealed his intent to obscure, hide, and dramatically devalue our assets with the intention of depriving me of my fair share.
> …
> Enshrined in our Constitution is the concept of due process, which is necessary for achieving a fair outcome. Whether by statute, logic, or case (e.g. Button v. Button, 131 Wis.2d 84, 95 (Wis. 1986)), each spouse must enter into the divorce agreement voluntarily and freely, or the outcome is not an agreement. A fair outcome (e.g. Judgment and MSA) cannot be coerced through misrepresented information but instead requires full and fair disclosure as necessary elements leading up to consent.
> …
> this Motion for Relief and Declaratory Order seeks…to find and declare …the entire divorce void. Only after reopening the case can the Court compel accurate financial disclosure statements from the Respondent and me, which are necessary to achieve a fair and equitable divorce. This will also give us the opportunity to reach more commonly understood custody terms, avoiding much, if not all of the litigation that has amassed as a result of our disputed views, which the Court cannot properly adjudicate without the proper 'starting point' that all parties desire."

138. The then Hon. Family Court Commissioner (FCC) Michael D. Rust, now Defendant, scheduled Elizabeth's Motion to be heard on April 5, 2023.


Case 2:25-cv-02028-PP Filed 10/30/25 Page 42 of 52 Document 1

139. Six days later, on February 22, 2023, Adam sought R.127's enforcement by motioning the WCC for an Order to Show Cause ("**OTSC**", R.148-149) to find Elizabeth in contempt of R.127 for her prudent unwillingness to sign Quitclaim Deeds that would have unjustly and irreversibly transferred Elizabeth's co-owned home and land to Adam even before gaining Keberlein's or Appellate Court review. This was an obvious attack on Plaintiff's loan collateral.

140. Oddly, Rust scheduled Adam's Motion to be heard on March 30, earlier than he had scheduled hearing Elizabeth's Motion (to declare R.127 void) on April 5.

141. On March 30, 2023, Rust acknowledged Elizabeth's Motion for Reconsideration (still pending Keberlein's decision) of the January 6-12, 2023 documents (e.g. R.127) and Elizabeth's Motion for Relief and Declaratory Order (R.146-147) pending Rust's review the following week. Further, during the March 30 hearing, Elizabeth noted and Rust summarized (R.165) her "pending litigation on this case that has a serious impact and a large amount of mistakes on the court record. The record needs to be fixed and figured out. The current Judgement [sic] is not accurate. This motion for contempt is premature." It would be another 10 days before Elizabeth's Motion for Reconsideration was denied by operation of law (Keberlein elected not to respond to it).

142. Regardless, Rust ridiculed Elizabeth's resistance to being coerced into R.127's falsified Judgment that Rust himself knew had been forged, since R.127 claimed to have been a reconstruction of a February 7, 2022 divorce that as of September 9, 2022, Rust himself was supposed to officiate and never had. R.127 bore FCC Bermingham's signature (Rust's predecessor), despite Rust knowing FCC Bermingham had retired seven months prior to R.127's creation. Rust found Elizabeth in contempt, ordered her to sign the Quitclaim Deeds as a purge condition, and scheduled a follow-up hearing. This increased the threat against Plaintiff's loan collateral.

143. On April 10, 2023, Elizabeth filed for a de novo trial of the March 30

Quitclaim Deed contempt hearing and filed an Appeal of the January 6-12, 2023 documents and decisions, specifically including R.127's award of her real estate to Adam.

144. On April 12, 2023, the Court scheduled the de novo trial of Rust's March 30, 2023 hearing that had found Elizabeth in contempt.

145. On April 19, 2023, despite the de novo trial, an open Appeal, and a Motion to Stay pending Appeal (R.207), Rust held a follow-up status conference to assess Elizabeth's compliance with Rust's de novo'd Order. Rust accused Elizabeth of "thumbing [her] nose at the court" for her failure to obey his dictates and awarded Adam financial damages based on Adam's mortgage application fees and more expensive interest rate changes.

146. On May 30, 2023, Adam's Motion for Elizabeth's Quitclaim Deed contempt was held. Elizabeth appeared under duress, as while still disagreeing with Keberlein's qualification to preside, her counsel advised her to attend so as to cooperate with judicial proceedings until her Appeal overturned R.127. Fortunately, Adam had falsified his mortgage application, so representatives appeared in Court on behalf of Adam's chosen mortgage lender. They were ready to testify that they and their firm would not honor Adam's mortgage application given the dispute regarding the falsified Judgment (R.127). Keberlein denied Adam's Motion, but left Elizabeth with thousands of dollars of unawarded defense fees as an implied punishment for refusing to consent to R.127. Further, Keberlein denied Elizabeth's Motion to Stay pending Appeal, leaving Adam no path forward and Elizabeth exposed to endless contempt charges for refusing to be coerced into R.127.

147. By now, it was even more clear that Keberlein would not recuse himself. As such, Elizabeth withdrew (R.258) her Motion for Relief and Declaratory Order (R.147) that Rust had ignored so as to perpetuate R.127. From Keberlein's comments regarding his denial of Elizabeth's Motion for Reconsideration and Motion to Stay, it was clear to all that Keberlein simply rejected all challenges to


Case 2:26-cv-02028-PP Filed 10/30/26 Page 44 of 52 Document 1

his qualification as well as to the validity of the Judgment with MSA (R.127) that he and the other Defendants had authored, filed, and sought to enforce. By denying Elizabeth's attorney fees on both April 13, 2023 and May 30, 2023, Keberlein had so depleted Elizabeth's financial position that she could also no longer justify paying for her counsel to prosecute her Motion before an obviously ineffective and biased court.

148. To alleviate her dire financial status, Elizabeth had feverishly sought better employment. Because of the ongoing litigation and need for cash, she had already been forced to defer (then withdraw) from her Masters of Business Administration program that would have accelerated and uplifted her career path. Instead, with nearly a decade of part time work as a phlebotomist, she could not find employment for her marketing and business consulting skills, at least within her geographical area.

149. On May 3, after an opportunity arose in Atlanta that quadrupled her income, she filed a Motion to Relocate with A.J.F. with a Parenting Plan. It maintained the same time for A.J.F. to spend with Adam and the plan fully paid for A.J.F.'s commute to and from Adam in Wisconsin. Every detail of A.J.F.'s experience was prepared for an upgraded experience: home, school, sports, access to the balance of his maternal family who lived in Atlanta, and surrounded by playmates from the young professional community. Elizabeth repeatedly invited Adam to help refine the relocation plan, but he consistently declined and insisted A.J.F. would not be permitted to relocate. Meanwhile, Adam faced contempt charges for repeatedly violating custody orders in 2022, including unilaterally choosing A.J.F.'s school. (Outside of the scope of this case, Adam would be found in contempt for his harmful custodial decisions.)

150. On July 18, 2023, Rust heard Elizabeth's Motion to Relocate. Within minutes, he denied it (R.288) without so much as taking testimony from available witnesses. Rust incorrectly applied the law, citing legal hurdles that Wisconsin statutes explicitly barred.

151. On August 4, 2023, after receiving and reading the Order, Elizabeth requested clarity from Rust, due to the urgency of the relocation request that was best achieved before A.J.F. began school in only a few weeks. Rust ignored Elizabeth's request and Rust's facially obvious misapplication of law.

152. On August 11, 2023, Keberlein heard de novo Elizabeth's Motion to Relocate. Once again, similar to the duress experienced on April 13, 2023, Elizabeth was forced to continue with the hearing, despite Keberlein's disqualification. Despite Adam failing to timely and properly object to Elizabeth's Parenting Plan and Relocation Motion as Wisconsin statutes required, Keberlein denied the Relocation, providing no option for Elizabeth to relocate and see A.J.F. under any circumstance, while also leaving Elizabeth facing financial ruin from two years of litigation and the ongoing deprivation of all marital assets.

153. Worst of all, the Defendants, led by Keberlein, had managed to deprive Elizabeth and Plaintiff of their Constitutional rights (see supra, Section V. A. ). Beyond Keberlein's disqualification, and others' support of his adjudication despite being disqualified, Keberlein's Order failed to comply with the statutory obligations set forth for child custody relocations, of minimal difference from Rust's own denials.

154. Keberlein's disregard for relocation statutes mirrored his disregard for adjudicating while disqualified for having authored a financial instrument that was under dispute (Appealed). It also mirrored his disregard for falsifying official court records (e.g. R.126-127).

155. In 2024, Neubauer, Lazar, and Grogan ignored facts, case law, and statutes to affirm Keberlein's falsified R.127. They didn't make R.127 valid, they simply failed to correct R.127 as mere error. So it advanced to the WI Supreme Court, where it was denied without review, necessitating its resolution with the U.S. Supreme Court.

**E. Wrongful order of a Receiver to enforce forged Judgment (R.127)**

156. On May 9, 2025 (skipping ~2000 pages of litigation), Plaintiff and Elizabeth filed



Case 2:26-cv-02028-PP Filed 10/30/26 Page 46 of 52 Document 1

Elizabeth's Petition with the U.S. Supreme Court (#24-7187), doing so in person.

157. Meanwhile, Keberlein had grown clearly frustrated with his ever-increasing national exposure and his inability to coerce Elizabeth into agreeing to R.127. Despite having prior notice of Elizabeth's U.S. Supreme Court filing, Keberlein opted to hold the May 9, 2025 hearing in her absence (that Keberlein would not permit via videoconference), denying more than two dozen actions, including two change of venue requests to gain a neutral adjudicator.

158. After threatening Elizabeth Fitzgibbon's incarceration, loss of physical custody, and loss of property (e.g. fines), Keberlein ordered Healy to act as a Receiver to review the repeatedly-documented encumbrance on the real estate and enforce the falsified R.127. Soon after, Plaintiff contacted Attorney Healy via phone and reviewed the case history. Shocked, Attorney Healy needed time to do due diligence. That was her last connection with Plaintiff.

159. Either Healy failed to fulfill her court-ordered investigative duty or ignored her duty and participated in enforcing the falsified divorce decree. But for at least Keberlein's acts, Healy would not have been involved. With at least Healy's official signature, Healy helped Defendant Fitzgibbon complete the transfer of Elizabeth's assets encumbered by the Plaintiff. Plaintiff was directly harmed by Healy's and Fitzgibbon's acts.

160. Plaintiff learned of Healy's and Adam's actions in late December 2025.

**F. Wrongful enforcement of R.127 ongoing.**

161. In late December, Elizabeth filed a Notice of Injury with the Attorney General's Office to sue many of the Defendants in WIED, then proceeded to do so on January 6, 2026 (26-CV-23).

162. Parker and Nelson were tasked with investigating the wrongdoings of the Defendants, yet elected not to proceed. Elizabeth filed an Amended Notice of Injury, seeking better prosecutorial support.

163. Plaintiff filed a Notice of Injury in April, 2026. He received zero response from

the A.G.'s Office.

164. The A.G.'s Office, however, responded to Elizabeth. Kaul and Peters notified WIED of their intent to defend the Defendants. They proceeded to make false claims about not only the case, but Elizabeth's Notice. They failed to retract their misrepresentations and continue to serve as Defendants' counsel despite the apparent conflict of interest.

165. Similarly, Marrufo, Kees, and Hall misrepresented facts and blocked judicial procedures to then claim cause for denial of Elizabeth's WIED cases. They failed to retract their misrepresentations and continue to serve as Defendants' counsel.

166. Most other sets of violations are still winding their way through Wisconsin's judicial appellate processes before likely heading to the U.S. Supreme Court in 2028-2029. Each set of violations includes an ever-expanding list of Defendants who either failed their duties to vacate the decisions and documents resulting from the January 6-12, 2023 period, failed to report them as obliged (e.g. misprision, or Wisconsin/WISBAR SCRs), or actively cooperated in implementing them, despite knowing (or having significant evidence) of the falsified nature of these documents. However, in September, the Appellate Court District II's Deputy Clerk advised Elizabeth and Plaintiff on proper filing procedures. Fortunately, the Deputy Clerk was audio recorded. Lazar, Gundrum, and LoCoco then denied nearly three dozen of Elizabeth's actions that related to resolving R.127, then denied Elizabeth's Motion for Reconsideration given the Deputy Clerk's error (or their own). This merely created more unnecessary legal work as it advances to the WI Supreme Court for resolution.

167. Plaintiff filed an Amended Notice of Injury with the A.G.'s Office in October 2026, notifying them of the conflicts of interest and the ongoing rights deprivations that he was suffering. Once again, zero response.

168. Despite knowing of the clear errors, Mabry and Bongers maintains the same erroneous records that defraud the U.S. Federal government (e.g. Social Security Administration's Title IV-D funding to Wisconsin), as well as the Plaintiff.



Case 2:26-cv-02028-PP Filed 10/30/26 Page 48 of 52 Document 1

169. Defendants Navarrette has continued to uphold R.127 despite knowing that it was falsified, as did Moffat and Rust.

170. Because these violations remain ongoing, and because they prevent the Plaintiff's loan from being repaid and block the Plaintiff's fundamental right to marry Elizabeth, an injunction is needed. WIED is the only court fit to adjudicate this case, as the Wisconsin court system has proven utterly incapable of managing paperwork, procedure, or resolving its errors and wrongs.

## VIII. RESERVATION OF RIGHTS

171. Plaintiff hereby explicitly reserves a right to bring separate and subsequent causes of action against the Defendants, and/or additional parties not yet named (but likely to emerge during discovery), arising out of the systemic failures, enforcement actions, and consequences of the Defendants' cooperation in creating, enforcing, and sustaining the forged divorce judgment record (R.127) as well as by Keberlein's ongoing refusal to disqualify himself or transfer the case to a fit court via a venue change, thus substituting most of the Defendants on the case.

a. Scope: This Complaint specifically targets the unconstitutional and unlawful creation of the forged divorce Judgment with MSA (R.127) as well as R.127's use and enforcement. It includes Keberlein's refusal to disqualify himself while (R.127) remained critical to the state divorce case yet timely and well disputed by the Plaintiff. It includes all other Defendants' conspiratorial enablement of Keberlein's actions.

b. Reservation of Claims Regarding Appellate and Judicial Affirmation: Plaintiff reserves the right to bring separate future actions against additional judicial officers and/or entities arising from the aforementioned Scope of the Instant Case, made possible through information made available during this case's discovery. Plaintiff

further reserves the right to bring separate future actions for offenses occurring outside the aforementioned Scope of the Instant Case.

c. Reservation of Custodial and Parental Rights: Plaintiff explicitly reserves the right to seek separate redress for the catastrophic custodial harms and the ongoing deprivation of his fundamental rights less codified by U.S.C.'s and case law, but no less protected by the U.S. Constitution and the U.S. Supreme Court's recognition of these fundamental rights (see supra, Section V. A. ). These may include (among others) Plaintiff's right to marry Elizabeth. Plaintiff does not waive or satisfy any claims regarding the deprivation of his rights.

d. Reservation of Claims against Trespassers: Pursuant to the Plaintiff reserves all claims against all Defendants and their agents or contractors, for enforcing facially defective, forged records (e.g. R.127).

e. No Waiver or Merger: The inclusion of these background facts is intended solely to establish malice, operative intent, and a continuous conspiratorial purpose, even if each Defendant had their own role and motives for participating and discrete benefits from not aiding Plaintiff in seeking justice. Reference to these acts is purely evidentiary and does not constitute a waiver, merger, or satisfaction of these claims within the current litigation.

## IX. JURY DEMAND

172. Pursuant to the Seventh Amendment and Fed. R. Civ. P. 38, Plaintiff demands trial by jury on all triable issues of fact.

## X. PRAYER FOR RELIEF

173. WHEREFORE, Plaintiff Robert Murray respectfully requests that this Court


Case 2:26-cv-02028-PP Filed 10/30/26 Page 50 of 52 Document 1

enter judgment in his favor and against all Defendants, providing both injunctive relief against R.127, the Orders resulting from May 9, 2025, and as follows.

174. Compensatory damages will need to be determined from evidence acquired by discovery, including but are expected to at least include:

a. Actual financial losses and the value of misappropriated marital assets sustained as deprived under the color of a void judgment.

b. Costs and expenses incurred in the exhaustive attempt to rectify a fraudulent record through state and federal appellate channels.

c. Catastrophic emotional distress, humiliation, the destruction of family reputation (e.g. Plaintiff's dating of a still-married woman), and Plaintiff's diminished personhood (e.g. inability to marry Elizabeth or become the father-in-law of A.J.F. or enjoy parental rights).

d. The distinct, independent injury of the deprivation of a truthful judicial record and the loss of access to a legitimate court of law.

175. Punitive Damages: An award of punitive damages against each Defendant in their individual capacity to punish their willful, malicious, and conspiratorial conduct in the enforcement of falsified records and the reckless subversion of the judicial process, and to deter such "conscience-shocking" fraud in the future.

**A. Fees and Costs**

176. Attorney's Fees and Costs: An award of all litigation costs, filing fees, and expert witness fees pursuant to 42 U.S.C. §1988, and attorney's fees should Plaintiff retain counsel during the pendency of this action.

**B. Other Relief**

177. General Relief: Any such other and further relief as this Court deems just, equitable, and proper.

Respectfully submitted, this ____th day of October, 2026.

By: Robert Murray

Robert Murray, Pro Se All Rights Reserved
823 E. Main St. #A119, Richmond, VA 23219
Phone: (804) 757-6542
Email: wied4RM@thecaseofthemissingmsa.org